IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MAJED A. ATTIA, | ) | CASE NO.  1:22-CV-01021-BYP |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| WARDEN JENNY HILDEBRAND, | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| Defendant. | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| | ) | |

This matter is before the magistrate judge pursuant to Local Rule 72.2.  Before the Court is the

Petition of Majed Attia ("Attia" or "Petitioner"), for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. §

2254. Attia is in the custody of the Ohio Department of Rehabilitation and Correction pursuant to journal

entry of sentence in the case *State v. Attia*, Lake County Court of Common Pleas Case No. 19-CR-001073.

For the following reasons, the undersigned recommends that the Petition be DENIED.

## I.    Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state

court, factual determinations made by state courts are presumed correct unless rebutted by clear and

convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir.

2012); *Montgomery v. Bobby*, 654 F.3d 668, 701 (6th Cir. 2011).  The state appellate court summarized

the facts underlying Attia's conviction as follows:

> {¶9} On the evening of September 27, 2019, Mentor High School held its
> homecoming football game. Spectators in attendance included Mr. Attia's
> younger brother, O.A.; his younger sister, Rana; and Robert Finucan
> ("Robbie"), who were all Mentor High School students.

1

### *Physical Altercation*

{¶10} The football game had a Hawaiian theme, and spectators in the student section wore beach clothing and were throwing around beach balls. At one point, Robbie and Rana both reached for the same beach ball, which resulted in some type of physical contact.

{¶11} O.A. was subsequently informed that Robbie had shoved his sister. According to O.A., Robbie had also made fun of Rana the week prior. O.A. angrily confronted Robbie at his seat. When Robbie attempted to leave the area, O.A. followed him around the stadium. O.A. also contacted Robbie multiple times via Snapchat wanting to fight. They eventually agreed to meet at Veteran's Park in Mentor to fight, although Robbie later stated that he did not plan to show up.

{¶12} Meanwhile, Mr. Attia was at his parents' house in Kirtland Hills with his close friends Elijah McDougall ("Mr. McDougall"), Isaiah Gullick ("Mr. Gullick"), Camryn Jennings ("Ms. Jennings"), and Sarah Keen ("Ms. Keen"). Mr. Attia and his friends had graduated from high school a couple of years prior. O.A. called Mr. Attia and told him what had happened between Robbie and their sister at the game. Mr. Attia and his four friends got into his Jeep, and Mr. Attia drove everyone to the game.

{¶13} Hailey Bernot ("Ms. Bernot") was a friend of Robbie and was watching the game. She witnessed O.A.'s encounter with Robbie and followed O.A. to Mr. Attia's Jeep. As O.A. entered the Jeep, she leaned into the window and told Mr. Attia, "Please don't hurt my friend." Mr. Attia replied, "I can't promise that."

{¶14} After picking up O.A., Mr. Attia used O.A.'s phone to call Robbie. He requested to speak to Robbie's father, but Robbie responded with expletives and hung up. Mr. Attia drove to the Finucan home in Mentor and pulled into the driveway. He and Mr. McDougall got out and went to the front door, but no one was home.

### *Dewaune Lewis*

{¶15} Mr. Attia and O.A. remained upset about what had happened to their sister at the football game. Mr. Attia called Dewaune Lewis ("Mr. Lewis") and drove everyone to pick him up at his house in Euclid.

{¶16} According to Mr. Attia, he had purchased marijuana from Mr. Lewis a few days prior. During that visit, Mr. Lewis mentioned that he was always at home babysitting and wanted to get to know Mr. Attia and his friends better. Mr. Attia mentioned that he was having a party on Friday and agreed to pick up Mr. Lewis.

2

{¶17} According to Mr. Lewis, however, Mr. Attia called that night because he wanted Mr. Lewis "to handle something" for him. Specifically, Mr. Attia offered to pay Mr. Lewis to fight for him. Mr. Lewis had never previously "hung out" with Mr. Attia but had seen him at the house of his older cousin, Billy Harper ("Mr. Harper"), who lived in Cleveland. According to Mr. Harper, he had previously told Mr. Attia that Mr. Lewis would help him fight.

### The Party

{¶18} After picking up Mr. Lewis, Mr. Attia drove everyone back to his house, where they congregated in his apartment-style bedroom. Additional friends arrived, including Miranda Briggs ("Ms. Briggs"), Kailey Sikora ("Ms. Sikora"), Jason Grove ("Mr. Grove"), and Mr. Grove's girlfriend, Alana Chester ("Ms. Chester"). Alexis Dion ("Ms. Dion"), who was Mr. McDougall's girlfriend, arrived later upon his request.

{¶19} Mr. Lewis, Mr. Attia, and the other attendees drank alcohol and smoked marijuana. Mr. Attia introduced Mr. Lewis to some of the attendees as "Billy's cousin." Most of the attendees had never met Mr. Lewis before, and many later testified that his presence and demeanor seemed unusual.

{¶20} Many attendees also later testified that Mr. Attia was upset during the party about the situation between Robbie and his sister. According to Ms. Dion, Mr. Attia spoke about getting "revenge" on behalf of his family. According to Ms. Chester, she encountered Mr. Attia, Mr. Lewis, and Mr. McDougall out on the balcony having a conversation that they did not want anyone else to hear.

{¶21} According to Mr. Lewis, Mr. Attia said that Robbie had beat his sister and that he wanted Mr. Lewis to "f**k Robbie up." To Mr. Lewis, this meant that he was supposed to beat Robbie up the best way he could. Mr. Attia did not want to fight Robbie himself because Robbie knew him. Mr. Lewis was not from the area, and no one knew anything about him.

{¶22} Mr. Lewis and Mr. Attia planned to leave the party "to go f**k Robbie up." Mr. Attia never said anything to Mr. Lewis about wanting to talk to Robbie or Robbie's father. Rather, Mr. Attia wanted Mr. Lewis to fight Robbie and told him that "if the father jumped in," Mr. Attia "was going to have [his] back."

{¶23} Mr. Gullick left the party at about 9 p.m. to meet his girlfriend at their apartment. Mr. McDougall and Ms. Dion also left the party to get food.

### The Offenses

{¶24} Eventually, four people remained at the party – Mr. Attia, Mr. Lewis, Ms. Keen, and Ms. Jennings. At about 10:30 p.m., Ms. Keen and Ms. Jennings were preparing to leave. Mr. Attia asked Ms. Keen to drive him to the Finucan

home. Ms. Keen responded that she did not want to drive him somewhere to fight. Mr. Attia stated that they were just going to talk to Robbie's father. All four got into Ms. Keen's car, and Mr. Attia gave Ms. Keen directions to the Finucan house.

{¶25} When they arrived, Ms. Keen pulled into the driveway but then parked on the street in front of the house. Mr. Lewis got out of the car, while everyone else, including Mr. Attia, stayed inside watching and waiting. Mr. Lewis walked to the front door and knocked. Joseph Finucan ("Mr. Finucan"), Robbie's father, opened the door slightly. Mr. Lewis asked where Robbie was, and Mr. Finucan responded that Robbie was not home. Mr. Finucan turned to his wife and told her to call the police, hoping this would scare off Mr. Lewis. As Mr. Finucan turned his head, Mr. Lewis punched him hard on the left side of his jaw. Mr. Finucan flew backwards into a wall and onto the floor. Mr. Lewis entered the house and headed up the stairs. Mrs. Finucan ran into the bathroom and called 911.

{¶26} Mr. Finucan's tooth had perforated his cheek, which caused him to bleed profusely from his mouth. He got up and went into his garage, where he grabbed a metal baseball bat. Mr. Lewis and Robbie came running down the stairs, at which time Mr. Finucan hit Mr. Lewis with the baseball bat. Mr. Finucan and Mr. Lewis wrestled on the ground while Robbie went to the garage and got a baseball bat. Mr. Lewis managed to scramble out the front door.

{¶27} Mr. Lewis returned to the backseat of Ms. Keen's car. He was bleeding heavily from a gash in his forehead. According to Mr. Lewis, he told Mr. Attia that he "beat Robbie up."

{¶28} Ms. Keen drove to Euclid to drop off Mr. Lewis at his house. When they arrived, Mr. Attia and Mr. Lewis got out of the car and spoke to Mr. Lewis's cousin, Mr. Harper. Mr. Attia came back to the car and asked Ms. Keen and Ms. Jennings if they had any cash on them, which they did not. According to Mr. Attia, he intended to purchase marijuana from Mr. Harper but realized he did not have any cash on him. According to Mr. Lewis, however, Mr. Attia paid him $5 that night.

{¶29} After dropping off Mr. Lewis, the three friends went to a BP gas station in Mentor. Mr. Attia purchased a Gatorade using his father's credit card, and Ms. Keen attempted to clean Mr. Lewis's blood from her car.

{¶30} At Mr. Attia's request, Ms. Keen dropped him off at Newell Creek, which is a housing development located near Mr. Attia's house. Mr. Attia called Mr. McDougall indicating that he was in trouble and needed to be picked up. Mr. McDougall and Ms. Dion picked up Mr. Attia at Newell Creek and dropped him off at his house.

{¶31} Mr. Attia later called both Ms. Chester and Ms. Sikora via FaceTime and told them not to talk about the football game.

{¶32} According to Mr. Lewis, Mr. Attia came back the next day and paid him $100. Mr. Attia stated that the police were questioning him, so he had to delete Mr. Lewis's phone number.

### *Police Investigation*

{¶33} Officers from the Mentor Police Department responded to Mrs. Finucan's 911 call. Mr. Finucan was taken to the hospital by ambulance, where he stayed overnight. He received a CT scan which revealed blood on his brain. He also sustained bruises all over his body. Robbie received a few scratches to his face but did not go to the hospital.

{¶34} Mr. Harper's girlfriend took Mr. Lewis to the hospital, where he received stiches to his forehead.

{¶35} After speaking to the Finucans, the police went to the Attia home to talk to O.A., who was not home. The police spoke with Mr. Attia, who called O.A. but did not mention his involvement in the matter.

{¶36} The police subsequently identified and interviewed the party attendees, Mr. Lewis, and Mr. Harper.

{¶37} Mr. Gullick and Mr. McDougall both made statements to police indicating that they were aware the situation could get out of hand and that they left the party to avoid involvement. At trial, however, Mr. McDougall contended that he had told the police "what they wanted to hear."

{¶38} Shortly after commencing the investigation, the police arrested both Mr. Lewis and Mr. Attia.

### *Indictment*

{¶39} In May 2020, the Lake County Grand Jury indicted Mr. Attia on the following four counts: complicity to aggravated burglary in violation of R.C. 2923.03(A)(1), a felony of the first degree, by knowingly soliciting or procuring Mr. Lewis to commit aggravated burglary in violation of R.C. 2911.11(A)(1) (count 1); complicity to aggravated burglary in violation of R.C. 2923.03(A)(2), a felony of the first degree, by knowingly aiding or abetting Mr. Lewis in committing aggravated burglary in violation of R.C. 2911.11(A)(1) (count 2); complicity to felonious assault in violation of R.C. 2923.03(A)(1), a felony of the second degree, by knowingly soliciting or procuring Mr. Lewis to commit felonious assault in violation of R.C. 2903.11(A)(1) (count 3); and complicity to felonious assault in violation of R.C. 2923.03(A)(2), a felony of the second degree, by knowingly aiding or

abetting Mr. Lewis in committing felonious assault in violation of R.C. 2903.11(A)(1) (count 4).

{¶40} Mr. Attia waived his right to arraignment and entered not guilty pleas to the charged offenses.

### *Jury Trial*

{¶41} The matter was tried to a jury over three days. The state presented testimony from several witnesses, including Ms. Bernot, Mr. and Mrs. Finucan, Robbie, Ms. Keen, Ms. Jennings, Ms. Briggs, Ms. Sikora, Mr. Grove, Ms. Chester, Ms. Dion, the investigating police officers, Mr. Lewis, and Mr. Harper.

{¶42} During his testimony, Mr. Lewis indicated that he had entered into a cooperation agreement with the state in which he agreed to plead guilty to burglary and attempted felonious assault and to testify truthfully upon the state's request. In return, the state agreed to recommend a prison sentence of no more than seven years.

{¶43} The state also obtained testimony from Mr. McDougall and Mr. Gullick as the court's witnesses, and presented numerous exhibits, including photographs, video recordings, and cell phone records.

{¶44} Following the state's case-in-chief, the defense moved for judgment of acquittal pursuant to Crim.R. 29(A), which the trial court denied.

{¶45} The defense presented testimony from O.A. and Mr. Attia. Upon resting, the defense renewed its motion for a judgment of acquittal pursuant to Crim.R. 29(A), which the trial court again denied.

{¶46} Following deliberation, the jury returned guilty verdicts on all four counts. The trial court ordered a presentence investigation, a drug and alcohol evaluation, and victim impact statements and scheduled the matter for sentencing.

### *Sentencing*

{¶47} At the sentencing hearing, the trial court determined that counts 1 and 2 and counts 3 and 4 merged for purposes of sentencing. The state elected to proceed with sentencing on counts 1 and 3.

{¶48} The trial court sentenced Mr. Attia to prison terms of eight to 12 years on count 1 and three years on count 3 to run concurrently, resulting in a total prison term of eight to 12 years. The trial court subsequently issued a judgment entry memorializing the jury's guilty verdicts and Mr. Attia's sentences.

*State v. Attia*, 2021-Ohio-2890, 2021 WL 3722094, at **1-5 (Ohio Ct. App. Aug. 23, 2021).

## II.  Procedural History

### A.  Trial Court Proceedings

On May 22, 2020, the Lake County Grand Jury indicted Attia on the following charges: complicity to aggravated burglary in violation of O.R.C. § 2923.03(A)(1), by knowingly soliciting or procuring Mr. Lewis to commit aggravated burglary in violation of O.R.C. § 2911.11(A)(1) (Count 1); complicity to aggravated burglary in violation of O.R.C. § 2923.03(A)(2), by knowingly aiding or abetting Mr. Lewis in committing aggravated burglary in violation of O.R.C. § 2911.11(A)(1) (Count 2); complicity to felonious assault in violation of O.R.C. § 2923.03(A)(1), by knowingly soliciting or procuring Mr. Lewis to commit felonious assault in violation of O.R.C. § 2903.11(A)(1) (Count 3); and complicity to felonious assault in violation of O.R.C. § 2923.03(A)(2), by knowingly aiding or abetting Mr. Lewis in committing felonious assault in violation of O.R.C. § 2903.11(A)(1) (Count 4).  (Doc. No. 5-1, Ex. 1.)  Attia entered pleas of not guilty to all charges.  (Doc. No. 5-1, Ex. 2.)

The case proceeded to jury trial on October 19, 2020.  (Doc. No. 5-5.)  On October 21, 2020, the jury returned its verdict, finding Attia guilty of all charges.  (Doc. No. 5-1, Ex. 3.)

On November 4, 2020, before sentencing, Attia moved for a new trial, based on the alleged insufficiency of evidence of complicity and discovery violations. (Doc. No. 5-1, Ex. 4.)  The State filed a response in opposition.  (Doc. No. 5-1, Ex. 5.)  On December 16, 2020, the trial court denied the motion on the merits.  (Doc. No. 5-1, Ex. 6.)

On December 2, 2020, the trial court held a sentencing hearing.  (Doc. No. 5-1, Ex. 7.)  The trial court found Counts One and Two and Counts Three and Four merged, and the State elected to proceed with sentencing on Counts One and Three.  (*Id.*)  The trial court sentenced Attia to a term of 8 to 12 years

in prison on Count One and three years in prison on Count 3, to run concurrently, resulting in an aggregate sentence of 8 to 12 years in prison.  (*Id.*)

## B.  Direct Appeal

Attia, through counsel, filed a timely notice of appeal to the Eleventh District Court of Appeals. (Doc. No. 5-1, Ex. 8.)  In his appellate brief, he raised the following assignments of error:

I.  The trial court erred in failing to order a judgment of acquittal pursuant to Ohio Rule of Criminal Procedure 29(A) on Count 1 due to the insufficiency of the evidence of each and every element of the crime of complicity to aggravated burglary by solicitation or procurement of Dewaune Lewis to commit aggravated burglary (T.p. 726, 830).

II.  The trial court erred in failing to order a judgment of acquittal pursuant to Ohio Rule of Criminal Procedure 29(A) on Count 2 due to the insufficiency of the evidence of each and every element of the crime of complicity to aggravated burglary by aiding or abetting Dewaune Lewis to commit aggravated burglary (T.p. 726, 830).

III.  The trial court erred in failing to order a judgment of acquittal pursuant to Ohio Rule of Criminal Procedure 29(A) on Count 3 due to the insufficiency of the evidence of each and every element of the crime of complicity to felonious assault against Joseph Finucan by solicitation or procurement of Dewaune Lewis to commit felonious assault against Joseph Finucan. (T.p. 726, 830).

IV.  The trial court erred in failing to order a judgment of acquittal pursuant to Ohio Rule of Criminal Procedure 29(A) on Count 4 due to the insufficiency of the evidence of each and every element of the crime of complicity to felonious assault against Joseph Finucan, by aiding or betting Dewaune Lewis to commit felonious assault against Joseph Finucan. (T.p. 726, 830).

(Doc. No. 5-1, Ex. 9.)  The State filed a brief in response.  (Doc. No. 5-1, Ex. 10.)

On August 23, 2021, the state appellate court affirmed Attia's convictions.  (Doc. No. 5-1, Ex. 11.) *See also State v. Attia*, 2021-Ohio-2890, 2021 WL 3722094, at *1.

On October 5, 2021, Attia filed a Notice of Appeal with the Supreme Court of Ohio.  (Doc. No. 5-1, Ex. 12.)  In his Memorandum in Support of Jurisdiction, Attia raised the following Propositions of Law:

I.  One who solicits or procures a Principal to commit a crime is not criminally liable under R.C. 2923.03(A)(1) for crimes that the Solicitor neither solicited, nor procured the Principal to commit.

II.    One does not act "knowingly" pursuant to R.C. 2901.22(B) when he is aware that his conduct will probably cause a certain result only if a specific person, who he believes is unlikely to be present, is present at the crime scene.

(Doc. No. 5-1, Ex. 13.)  The State filed a response in opposition.  (Doc. No. 5-1, Ex. 14.)

On December 14, 2021, the Supreme Court of Ohio declined to accept jurisdiction of the appeal pursuant to S.Ct. Prac.R. 7.08(B)(4).  (Doc. No. 5-1, Ex. 15.)

## C.    Federal Habeas Petition

On June 14, 2022, Attia, through counsel, filed a Petition for Writ of Habeas Corpus in this Court and asserted the following grounds for relief:

**GROUND ONE**: The evidence was insufficient to prove that Mr. Attia knowingly solicited or procured Dewaune Lewis to commit aggravated burglary (Count One).

**GROUND TWO**: The evidence was insufficient to prove that Mr. Attia knowingly solicited or procured Mr. Lewis to commit a felonious assault on Mr. Finucan (Count Three).

(Doc. No. 1-1.)

On August 11, 2022, Warden Jenny Hildebrand ("Respondent") filed the Return of Writ.  (Doc. No. 5.)  Attia filed a Traverse on September 12, 2022.  (Doc. No. 6.)

## III. Review on the Merits

### A.    Legal Standard

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The relevant provisions of AEDPA state:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

9

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings (as opposed to the dicta) of the United States Supreme Court. *See Parker v. Matthews*, 567 U.S. 37, 132 S.Ct. 2148, 183 L.Ed.2d 32 (2012); *Renico v Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1865-1866 (2010); *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Shimel v. Warren,* 838 F.3d 685, 695 (6th Cir. 2016); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005). Indeed, the Supreme Court has indicated that circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court." *Parker*, 567 U.S. at 48-49; *Howes v. Walker*, 567 U.S. 901, 132 S.Ct. 2741, 183 L.Ed.2d 612 (2012). *See also Lopez v. Smith*, —— U.S. ——, 135 S.Ct. 1, 4, 190 L.Ed.2d 1 (2014) (per curiam) ("Circuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.'" (quoting *Marshall v. Rodgers*, 569 U.S. 58, 133 S.Ct. 1446, 1450, 185 L.Ed.2d 540 (2013))).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413. By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id. See also Shimel*, 838 F.3d at 695. However, a federal district court may not find a

10

state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor,* 529 U.S. at 411.  Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law.  *Id.* at 410-12.  "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 F. App'x 511, 516 (6th Cir. 2006) (citing *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

In *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA.  *Id.* at 786 (internal quotation marks omitted).  The Court admonished that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 785.  The Court noted that Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Id*. (internal quotation marks omitted).  Therefore, a petitioner "must show that the state court's ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786–87.  This is a very high standard, which the Supreme Court readily acknowledged.  *See id.* at 786 ("If this standard is difficult to meet, that is because it is meant to be.")

### 1. Sufficiency of the Evidence

#### a. Ground One

In Ground One, Attia argues there was insufficient evidence to prove he knowingly solicited or procured Dewaune Lewis to commit aggravated burglary (Count One).  (Doc. No. 1-1 at 15.)  Attia argues

the basis for the state appellate court's finding of sufficient evidence on Ground One "was *not* because Mr. Attia had solicited or procured Dewaune Lewis to enter the victim's home, but rather because Mr. Lewis – who was drunk and has a low I.Q. – '*believed* Mr. Attia wanted him to do so.'" (*Id.* at 15-16) (emphasis in original) (citation omitted). Attia argues that "[b]ecause that is not enough to establish that [he] 'knowingly' solicited or procured Mr. Lewis to enter the Finucan home, this Court should vacate the conviction." (*Id.* at 16.)

In response, Respondent argues that Attia fails to demonstrate that the decision of the state appellate court finding sufficient evidence to support the conviction on Ground One "involved an unreasonable determination of the facts or an unreasonable application of *Jackson*." (Doc. No. 5 at 22.)

In his Traverse, Attia argues that "the evidence did not establish [he] believed there was a high probably [sic] Mr. Lewis would unlawfully enter Mr. Finucan's home." (Doc. No. 6 at 2.)

Attia raised a sufficiency of the evidence claim to both the state appellate court and the Supreme Court of Ohio. (Doc. No. 5-1, Ex. 9, 13.) The state appellate court considered this claim on the merits and rejected it as follows:

> {¶5} Second, construing the evidence in a light most favorable to the state, the state produced sufficient evidence, if believed, to establish the elements of complicity to aggravated burglary (count 1) beyond a reasonable doubt. A reasonable jury could infer Mr. Attia was aware that soliciting or procuring the principal offender to assault Robert Finucan ("Robbie") at the Finucan home would probably cause a certain result, i.e., the principal offender trespassing into the Finucan home.

> {¶6} In addition, to establish aggravated burglary, the state was not required to prove that Robbie's father ("Mr. Finucan") was the intended victim of the underlying criminal offense or that Mr. Attia was aware that the principal offender would inflict, attempt to inflict, or threaten to inflict physical harm to Mr. Finucan. Rather, the state met its burden of production by establishing that Robbie was the intended victim and that both Mr. Finucan and Robbie suffered physical harm.

> * * *

12

{¶57} We address Mr. Attia's first and third assignments of error together, where he contends that the trial court erred by denying his Crim.R. 29 motion for acquittal because the state failed to produce sufficient evidence to sustain his convictions, respectively, on count 1 (complicity to aggravated burglary by soliciting or procuring) and on count 3 (complicity to felonious assault by soliciting or procuring).

{¶58} Crim.R. 29(A) provides that "[t]he court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses." Thus, when a defendant makes a Crim.R. 29 motion, he or she is challenging the sufficiency of the evidence introduced by the state. *State v. Patrick*, 11th Dist. Trumbull Nos. 2003-T-0166 & 2003-T-0167, 2004-Ohio-6688, ¶ 18.

{¶59} "'"[S]ufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "In essence, sufficiency is a test of adequacy." *Id.*

{¶60} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶61} When evaluating the adequacy of the evidence, we do not consider its credibility or effect in inducing belief. *Thompkins* at 387. Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law. *Id.* at 386. In addition, circumstantial evidence and direct evidence inherently possess the same probative value, even when used to prove essential elements of an offense. *See Jenks* at 272.

### Complicity to Aggravated Burglary

{¶62} Mr. Attia was convicted in count 1 of complicity in violation of R.C. 2923.03(A)(1) by knowingly soliciting or procuring Mr. Lewis to commit aggravated burglary in violation of R.C. 2911.11(A)(1).

13

{¶63} R.C. 2923.03 defines complicity. It provides, in relevant part, that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * *[s]olicit* or *procure* another to commit the offense." (Emphasis added.) R.C. 2923.03(A)(1). A defendant who commits complicity in the commission of an offense "is prosecuted and punished as if he were a principal offender." R.C. 2923.03(F).

{¶64} The statute does not define the terms "solicit" or "procure." The trial court used the definitions set forth in the Ohio Jury Instructions, which define "solicit" as "to seek, to ask, to influence, to invite, to tempt, to lead on, to bring pressure to bear" and "procure" as "to get, obtain, induce, bring about, motivate." *Ohio Jury Instructions*, CR Section 523.03(A) (Rev. February 6, 2016). This court has adopted these definitions. *See In re S.J.F.*, 11th Dist. Geauga No. 2010-G-2960, 2010-Ohio-5514, ¶ 18.

{¶65} R.C. 2911.11 defines aggravated burglary. It provides, in relevant part, that "[1] [n]o person, by force, stealth, or deception, [2] shall trespass in an occupied structure * * *, [3] when another person other than an accomplice of the offender is present, [4] with purpose to commit in the structure * * * any criminal offense, [5] if any of the following apply: * * * [t]he offender inflicts, or attempts or threatens to inflict physical harm on another * * *." R.C. 2911.11(A)(1).

### *Trespass*

{¶66} Mr. Attia first contends that the state failed to produce "any evidence" that he knowingly solicited or procured Mr. Lewis to trespass into the Finucan home.

{¶67} A person trespasses when he or she "[k]*nowingly* enter[s] * * * the land or premises of another * * * without privilege to do so." (Emphasis added.) R.C. 2911.21(A)(1). *See* R.C. 2911.10 (defining trespass, for purposes of the burglary statute, as a violation of R.C. 2911.21).

{¶68} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact." R.C. 2901.22(B).

{¶69} This court has previously stated that the legal concept of "knowingly" incorporates the scienter requirement that one ought to know one's actions will "probably cause certain results." *State v. Magnusson*, 11th Dist. Lake No. 2006-L-263, 2007-Ohio-6010, ¶ 51.

{¶70} Because a defendant's mental state is difficult to demonstrate with direct proof, it may be inferred from the circumstances surrounding the offense. *State v. Worthy*, 11th Dist. Lake No. 2004-L-137, 2005-Ohio-5871, ¶ 24; *State v. Johnson*, 93 Ohio St.3d 240, 245, 754 N.E.2d 796 (2001). In the context of complicity, the relevant circumstances include the defendant's conduct "'before and after the offense is committed.'" *Johnson* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971).

{¶71} In support of his argument, Mr. Attia relies on Mr. Lewis's volunteered statement during cross-examination, in which he stated, "That was my fault that I went in house [sic]." According to Mr. Attia, this testimony "conclusively proves" that he never "sought, asked, influenced, invited, or pressured" Mr. Lewis "to enter the Finucan home at all."

{¶72} Mr. Attia quotes Mr. Lewis's statement out of context. The remainder of the referenced exchange was as follows:

{¶73} "Q. That was your fault.

{¶74} "A. Yes.

{¶75} "Q. That was not [Mr. Attia's] fault, was it?

{¶76} "A. Well, [Mr. Attia] took me to the house.

{¶77} "Q. But he didn't tell you to go in the house?

{¶78} "A. No, he did not tell me to go in the house but he took me to the house.

{¶79} "Q. He took you to the house.

{¶80} "A. [Mr. Attia] knew what he was doing.

{¶81} "Q. Okay.

{¶82} "A. You knew them people knew him and knew his brother.

{¶83} "Q. Okay.

{¶84} "A. Come on now, I might not be from down here but you don't got to try to play me like I'm slow."

{¶85} Mr. Attia's argument also does not acknowledge the following testimony during Mr. Lewis's direct examination:

{¶86} "Q. What did [Mr. Attia] tell you he wanted you to do to Robbie?

{¶87} "A. He wanted me to f**k Robbie up.

{¶88} "* * *

{¶89} "Q. [Mr. Attia] told you he wanted you to f**k Robbie up?

{¶90} "A. Yeah, when somebody's that mad what else do you expect they take you to somebody's house, they show you the house.

{¶91} "Q. Okay. What does f**k somebody up mean to you?

{¶92} "A. Beat them up the best way you can.

{¶93} "Q. What do you mean the best way you can?

{¶94} "A. Just that's the way I took it. Especially with him being mad, that's the only thing on his mind, yeah, that's the way I took it. That's how he wanted it cause if he didn't he would have never took me to the house and pointed out the house."

{¶95} Thus, contrary to Mr. Attia's assertion, Mr. Lewis did not testify that entering the Finucan home was his own idea. Rather, he believed Mr. Attia wanted him to do so.

{¶96} Mr. Lewis's apparent acceptance of responsibility for some of his actions does not negate Mr. Attia's complicity. In fact, a complicity offense requires that the principal offender has "actually committed" the underlying offense. *See* R.C. 2923.03(C) ("No person shall be convicted of complicity under this section unless an offense is actually committed * * *").

{¶97} Further, the definitions of "solicit" and "procure" encompass more than an express request that the principal offender perform a specific act. *See Johnson, supra*, at 245 ("The fact that defendant did not articulate his intent will not allow him to escape responsibility for his clear actions of complicity * * *").

{¶98} Mr. Attia also relies on the Ninth District Court of Appeals' decision in *State v. Rohr-George*, 9th Dist. Summit No. 23019, 2007-Ohio-1264. In that case, the defendant was convicted of complicity after her current lover murdered her former lover. *Id.* at ¶ 1. On appeal, the Ninth District held that the state failed to present sufficient evidence that the defendant solicited or procured the principal offender to commit the murder. *Id.*

{¶99} The court acknowledged that the state was not required to present evidence of a "specific statement to solicit the murder." *Id.* at ¶ 28. However, the state was required to present evidence "from which a reasonable fact finder could infer that the defendant, acting with the specific purpose to cause a murder, did something to seek, ask, influence, invite, tempt, lead on,

16

pressure, get, obtain, induce, bring about, or motivate the principal to commit the murder." *Id.* The court found that the record before it contained "*no such evidence* to evaluate." (Emphasis added.) *Id.* Specifically, the state presented "*no evidence of anything that [the defendant] said or did* from which a reasonable fact finder could have concluded that [she], acting with the specific intent to cause [the victim's death], solicited or procured [the principal offender] to murder him." (Emphasis added.) *Id.*

{¶100} We do not find *Rohr-George* to be instructive. Unlike that case, the state presented numerous witnesses and documentary evidence establishing Mr. Attia's conduct before, during, and after the offenses. In fact, Mr. Attia concedes that the state presented sufficient evidence to establish that he asked Mr. Lewis to "beat up Robbie."

{¶101} The state cites in support of its argument the Ninth District's decision in *State v. Sprenz*, 9th Dist. Summit No. 18254, 1998 WL 78675 (Feb. 11, 1998). In that case, the defendant agreed to pay the principal offender $500 to "scare" the victim and gave him the victim's address. *Id.* at *1. The principal offender subsequently appeared on the victim's porch and asked if she was there. *Id.* After being informed that she was not, the principal offender broke the front door window, entered the house, assaulted the victim with a stun gun, and set the house on fire. *Id.* The defendant subsequently paid the principal offender $300 and congratulated him on a "good job." *Id.*

{¶102} The defendant was subsequently convicted of complicity to commit aggravated burglary, among other offenses. *Id.* at *2. On appeal, the defendant contended that there was no evidence that he did anything more than ask someone to "scare" the victim. *Id.* at *3. Therefore, there was no evidence that he asked anyone to break into the victim's house. *Id.* The Ninth District disagreed and found that the jury could reasonably infer that the defendant intended for the principal offender to scare the victim at her home and that the "scare" the defendant sought included trespassing into the victim's dwelling for the purpose of feloniously assaulting her. *Id.*

{¶103} We agree with the state that *Sprenz* is factually similar to the present case. Further, the evidence regarding Mr. Attia's conduct permits an even stronger inference than in *Sprenz*.

{¶104} Mr. Lewis testified that Mr. Attia picked him up "to handle something." Specifically, Mr. Attia offered to pay him to "f**k Robbie up." After they "got drunk" at the party, Mr. Attia told Mr. Lewis that the plan was "to go f**k Robbie up" because Robbie had beat Mr. Attia's sister. Ms. Keen testified that Mr. Attia asked her to drive him and Mr. Lewis to the Finucan home, which she did. There is no dispute that, upon their arrival, Mr. Lewis trespassed into the Finucan home by force. There is no evidence that Mr. Attia attempted to stop Mr. Lewis from doing so.

17

{¶105} Following the offenses, Ms. Keen drove Mr. Lewis back to his house in Euclid despite the fact that he was "covered in blood" and bleeding from a "huge gash" in his forehead. Ms. Keen and Ms. Jennings both testified that after arriving at Mr. Lewis's house, Mr. Attia asked them if they had any cash. Mr. Lewis testified that Mr. Attia paid him $5 that night.

{¶106} There is also no dispute that Mr. Attia asked Ms. Keen to drop him off at a housing development in Newell Creek rather than at his house. Mr. Attia called Mr. McDougall, who arrived in his car with Ms. Dion and drove Mr. Attia home.

{¶107} After the police responded to Mrs. Finucan's 911 call, they went to the Attia home and spoke to Mr. Attia, who failed to disclose his involvement in the matter. Ms. Chester and Ms. Sikora both testified that Mr. Attia called them via FaceTime and told them not to talk about the football game.

{¶108} Finally, Mr. Lewis testified that Mr. Attia came back the next day and paid him $100, at which time Mr. Attia stated that he had to delete Mr. Lewis's number because the police were questioning him.

{¶109} Given the foregoing evidence, we conclude a reasonable jury could infer Mr. Attia was aware that soliciting or procuring Mr. Lewis to assault Robbie at the Finucan home would probably cause a certain result, i.e., Mr. Lewis trespassing into the Finucan home.

*State v. Attia*, 2021-Ohio-2890, 2021 WL 3722094, at **1, 6-10.

The Due Process Clause of the Fourteenth Amendment requires that a criminal conviction be supported by proof beyond a reasonable doubt with respect to every fact necessary to constitute the offense charged. *In re Winship*, 397 U.S. 358, 363–64, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The standard for determining if a conviction is supported by sufficient evidence is "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 317, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In making such a determination, a district court may not substitute its own determination of guilt or innocence for that of the factfinder, nor may it weigh the credibility of witnesses. *Id. See also Walker v. Engle*, 703 F.2d 959, 970 (6th Cir. 1983). Moreover, federal courts are required to give deference to factual determinations made in state court and "[a]ny conflicting inferences

18

arising from the record ... should be resolved in favor of the prosecution." *Heinish v. Tate*, 1993 WL 460782, at *3 (6th Cir. 1993) (citing *Walker*, 703 F.3d at 969–70*.) See also Wright v. West*, 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (the deference owed to the trier of fact limits the nature of constitutional sufficiency review.)

Consistent with these principles, the Supreme Court has emphasized that habeas courts must review sufficiency of the evidence claims with "double deference:"

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, 'it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.' *Cavazos v. Smith*, 565 U.S. 1, ——, 132 S.Ct. 2, 4, 181 L.Ed.2d 311 (2011) (*per curiam*). And second, on habeas review, 'a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Ibid.* (quoting *Renico v. Lett*, 559 U.S. 766, ——, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010)).

*Coleman v. Johnson*, 566 U.S. 650, 132 S.Ct. 2060, 2062, 182 L.Ed.2d 978 (2012). Under this standard, "we cannot rely simply upon our own personal conceptions of what evidentiary showings would be sufficient to convince us of the petitioner's guilt," nor can "[w]e ... inquire whether any rational trier of fact would conclude that petitioner ... is guilty of the offenses with which he is charged." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). Rather, a habeas court must confine its review to determining whether the state court "was unreasonable in its conclusion that a rational trier of fact could find [petitioner] guilty beyond a reasonable doubt based on the evidence introduced at trial." *Id.* (emphasis in original) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009)).

Upon careful review of the trial transcript, the Court finds the state appellate court reasonably determined Attia's conviction on Count One was supported by sufficient evidence. In resolving Attia's sufficiency of the evidence claim, the state appellate court accurately summarized the evidence and

correctly identified the applicable law.  As the state appellate court noted, Lewis testified Attia "picked him up 'to handle something'"; specifically, Attia offered to pay Lewis "to 'f\*\*k Robbie up.'"  *State v. Attia*, 2021-Ohio-2890, 2021 WL 3722094, at \*9.  Attia asked Keen to drive them to the Finucan home, which she did.  *Id.*  There was no evidence Attia attempted to stop Lewis from entering the Finucan home by force.  *Id.*  Afterward, Keen took Lewis back to his house in Euclid, although he was "'covered in blood' and bleeding from a 'huge gash' in his forehead."  *Id.*  After arriving at Lewis' house, Attia asked Keen and Jennings if they had any cash and paid Lewis $5 that night.  *Id.*  Attia had Keen drop him off at a housing development in Newell Creek rather than at his house and called McDougall to pick him up and take him home.  *Id.*  When police arrived at the Attia home looking to speak with Attia's younger brother O.A., they spoke to Attia, who did not disclose his involvement in the matter.  *Id.*  Attia called Chester and Sikora that night and told them not to talk about the football game.  *Id.*  Attia paid Lewis $100 the next day and told Lewis he had to delete Lewis' number because the police were questioning him.  *Id.* at \*10.

In addition, Bernot testified that when Attia arrived at the football game to pick up O.A., she told Attia "please don't hurt my friend," and Attia responded, "I can't promise that."  (Doc. No. 5-5 at 152-53.)  Attia earlier in the evening had driven to the Finucan residence looking for Mr. Finucan, but no one answered the door.  (Doc. No. 5-5 at 307.)  Afterward, Attia drove to Euclid to pick up Lewis.  (*Id.*)  Attia and O.A. were upset their sister had gotten hurt at the football game.  (*Id.* at 310.)  After arriving back at his residence for a party, Attia continued to be upset and "worked up."  (*Id.* at 332.)  Chester testified that when she walked out onto Attia's balcony, Attia, Lewis, and McDougall were having a conversation it seemed they did not want anyone to hear.  (Doc. No. 5-6 at 35.)  Gullick admitted he told the police he texted his girlfriend that they were "going to go get into some shit" that night and that he had deleted the text before speaking to the police because he did not want his girlfriend involved.  (*Id.* at 64-68.)  Dion testified that Lewis and Attia had a "focused" conversation that night about Attia getting upset about his

20

sister.  (*Id.* at 176.)  Dion remembered Attia saying things like "you don't fuck with my family," "I'm going to get revenge," and "they are going to pay for that."  (*Id.*)  Dion recalled Attia and Lewis going outside to smoke a few times.  (*Id.* at 177.)  Dion testified later in the night Attia called McDougall saying he was in trouble and needed to be picked up.  (*Id.* at 181.)  When Dion and McDougall arrived at the housing development, Attia "came out of like a very like vague area from like in between houses like by the trees" and they weren't sure where he was coming from.  (*Id.* at 182.)  Attia asked them to drive him back to his house before the cops came.  (*Id.* at 183.)  Attia told Keen to pull up in front of the Finucan house.  (*Id.* at 211.)  Billy Harper, Lewis' cousin, testified he had told Attia that Lewis would help him fight and when Attia called Harper that night, he heard Attia tell Lewis on speaker phone that Attia wanted Lewis to help him with something.  (*Id.* at 285-86.)  Harper further testified McDogall tried to call or text him numerous times after the incident.  (*Id.* at 290.)

It is not for this Court to weigh evidence or determine credibility.  *See Jackson*, 443 U.S. at 317-19; *Coleman*, 566 U.S. at 651.  While Attia interprets evidence in a light most favorable to him, that is not the standard – the Court must view the evidence in a light most favorable to the prosecution.  *Jackson*, 443 U.S. at 319.

Under the "doubly deferential" standard, the Court cannot say the state court "was unreasonable in its conclusion that a rational trier of fact could find [petitioner] guilty beyond a reasonable doubt based on the evidence introduced at trial."  *Brown v. Konteh*, 567 F.3d at 205.  Accordingly, it is recommended the Court find Ground One lacks merit.

### b.  Ground Two

In Ground Two, Attia argues there was insufficient evidence "to prove that [he] knowingly solicited or procured Mr. Lewis to commit a felonious assault on Mr. Finucan."  (Doc. No. 1-1 at 21.)

Attia asserts the state appellate court found, without explanation, that Attia could have been aware that Lewis "would 'probably' assault" Mr. Finucan.  (*Id.*)  Attia argues:

> Mr. Attia did not dispute on appeal and does not dispute now that, when the evidence is viewed in the light most favorable to the prosecution, the jury could have found that Mr. Attia asked Mr. Lewis to "beat up Robbie." (Trial Tr. at 518.)  However, there is no evidence that proves beyond a reasonable doubt that Mr. Attia knowingly solicited or procured Mr. Lewis to cause physical harm to Mr. Finucan.  Mr. Lewis did not testify that Mr. Attia asked Mr. Lewis to cause serious physical harm to Mr. Finucan.  (Trial Tr. at 540.) Additionally, no evidence proved beyond a reasonable doubt that a felonious assault against Mr. Finucan would probably – more likely than not – occur. Indeed, even crediting Mr. Attia's statement that "if the father jumps in, I'll have your back," this suggests a possibility – not a probability – in light of the fact that only hours earlier Mr. Attia had visited the Finucan home to attempt to talk with Mr. Finucan about Robbie's actions.

(*Id.* at 21-22.)

Respondent argues that "[f]rom Attia's statement, a rational juror could infer that Attia was aware that soliciting or procuring Mr. Lewis to assault Robbie at the Finucan home would probably cause a certain result, i.e., Mr. Lewis feloniously assaulting Robbie and/or Mr. Finucan." (Doc. No. 5 at 26.) Respondent asserts that Attia fails to demonstrate "that the decision of the Ohio Court of Appeals to this effect involved an unreasonable determination of the facts or an unreasonable application of *Jackson*." (*Id.* at 26-27.)

In his Traverse, Attia maintains that the evidence did not speak "*Mr. Attia's belief* as to the probability of violence between Mr. Lewis and Mr. Finucan," and so the evidence was "insufficient to support his ultimate conviction." (Doc. No. 6 at 5) (emphasis in original).

Attia raised a sufficiency of the evidence claim to both the state appellate court and the Supreme Court of Ohio.  (Doc. No. 5-1, Ex. 9, 13.)  The state appellate court considered this claim on the merits and rejected it as follows:

> {¶7} Finally, construing the evidence in a light most favorable to the state, the state produced sufficient evidence, if believed, to establish the elements of complicity to felonious assault (count 3) beyond a reasonable doubt. The

principal offender's testimony indicates that Mr. Attia expressly contemplated Mr. Finucan being assaulted. Therefore, a reasonable jury could infer from Mr. Attia's assurance to the principal offender that "if the father jumped in," Mr. Attia "was going to have [his] back," Mr. Attia was aware that soliciting or procuring the principal offender to assault Robbie at the Finucan home would probably cause a certain result, i.e., Mr. Lewis feloniously assaulting Robbie and/or Mr. Finucan.

\* \* \*

{¶120} Mr. Attia was convicted in count 3 of complicity in violation of R.C. 2923.03(A)(1) by knowingly soliciting or procuring Mr. Lewis to commit felonious assault against Mr. Finucan in violation of R.C. 2903.11(A)(1).

{¶121} R.C. 2903.11(A)(1) provides, in relevant part, that "[n]o person shall *knowingly* \* \* \* [c]ause serious physical harm to another \* \* \*." (Emphasis added.)

{¶122} The applicable definitions of "solicit," "procure," and "knowingly" are set forth above.

### Solicit or Procure

{¶123} Mr. Attia first contends that Mr. Lewis's following testimony during cross-examination "proves" that he did not ask Mr. Lewis to feloniously assault Mr. Finucan:

{¶124} "Q. What happened next or why did you, why did you punch the father?

{¶125} "A. I was drunk.

{¶126} "Q. You were drunk?

{¶127} "A. Yes, I wasn't thinking right in my mind. I wasn't thinking right.

{¶128} "\* \* \*

{¶129} "Q. You're the one that punched the dad in the face?

{¶130} "A. Yes.

{¶131} "Q. And you're the one that ran upstairs to get Robbie?

{¶132} "A. Yes, yes.

{¶133} "Q. Okay. And that was all you?

{¶134} "A. Yes, okay."

23

{¶135} Once again, Mr. Attia quotes Mr. Lewis's testimony out of context. The remainder of the first referenced exchange was as follows:

{¶136} "Q. [Mr. Attia] never told you to punch the father, did he?

{¶137} "A. He also didn't tell me not to go up to the house.

{¶138} "Q. Okay. But he never told you to punch the father?

{¶139} "A. He also didn't tell me not to go up to the house."

{¶140} Contrary to Mr. Attia's assertion, this testimony does not establish that Mr. Lewis *only* feloniously assaulted Mr. Finucan because he was drunk or that feloniously assaulting Mr. Finucan was not part of the plan. As indicated, Mr. Lewis's admission of criminal liability does not negate Mr. Attia's complicity, and the definitions of "solicit" and "procure" encompass more than an express request.

### *Knowingly*

{¶141} Mr. Attia next contends that even if he asked Mr. Lewis to "beat up" Robbie, the state produced "no evidence" that Mr. Lewis's felonious assault of Mr. Finucan was "probably (more likely than not) to occur." He argues that inferring knowledge would be "incompatible with logic and common sense."

{¶142} Mr. Attia's argument does not acknowledge Mr. Lewis's following testimony:

{¶143} "Q. So did [Mr. Attia] talk to you about what the plan was?

{¶144} "A. Yeah, to go f**k Robbie up.

{¶145} "Q. So you left the party?

{¶146} "A. Yeah, we all did.

{¶147} "* * *

{¶148} "Q. Did [Mr. Attia] ever tell you he wanted you to go talk to --

{¶149} "A. No.

{¶150} "Q. -- Robbie?

{¶151} "A. He didn't say nothing about talking.

{¶152} "Q. Did he say he wanted to talk to Robbie's dad?

{¶153} "A. No, he didn't say nothing about talking.

24

{¶154} "Q. What did he say to you?

{¶155} "A. He wanted me to fight Robbie and he says if the father jumped in he was going to have my back.

{¶156} "Q. If who jumped in?

{¶157} "A. Robbie's father.

{¶158} "Q. Okay. So [Mr. Attia] told you if Robbie's father jumped in he would have your back?

{¶159} "A. Yeah."

{¶160} The foregoing testimony indicates that Mr. Attia expressly contemplated Mr. Finucan being assaulted. Therefore, a reasonable jury could infer from Mr. Attia's assurance to Mr. Lewis that "if the father jumped in," Mr. Attia "was going to have [his] back" that Mr. Attia was aware that soliciting or procuring Mr. Lewis to assault Robbie at the Finucan home would probably cause a certain result, i.e., Mr. Lewis feloniously assaulting Robbie and/or Mr. Finucan.

{¶161} Accordingly, construing the evidence in a light most favorable to the state, the state produced sufficient evidence, if believed, to establish the elements of complicity to felonious assault beyond a reasonable doubt.

{¶162} Mr. Attia's third assignment of error is without merit.

*State v. Attia*, 2021-Ohio-2890, 2021 WL 3722094, at **1, 11-12.

Upon careful review of the trial transcript, the Court finds the state appellate court reasonably determined Attia's conviction on Count Three was supported by sufficient evidence. In resolving Attia's sufficiency of the evidence claim, the state appellate court accurately summarized the evidence and correctly identified the applicable law. As the state appellate court noted, Lewis testified Attia told him if Robbie's father "jumped in," Attia was going to have Lewis's back. *Id.* at 12. In addition, the attack happened at 10:30 p.m. (Doc. No. 5-5 at 187), a time when it could reasonably be expected that Mr. Finucan would be home.

It is not for this Court to weigh evidence or determine credibility. *See Jackson*, 443 U.S. at 317-19; *Coleman*, 566 U.S. at 651. While Attia interprets evidence in a light most favorable to him, that is not

25

the standard – the Court must view the evidence in a light most favorable to the prosecution. *Jackson*, 443 U.S. at 319.

Under the "doubly deferential" standard, the Court cannot say the state court "was unreasonable in its conclusion that a rational trier of fact could find [petitioner] guilty beyond a reasonable doubt based on the evidence introduced at trial." *Brown v. Konteh*, 567 F.3d at 205.  Accordingly, it is recommended the Court find Ground Two lacks merit.

## IV.  Conclusion

For all the reasons set forth above, it is recommended that the Petition be DENIED.


Date: January 17, 2023                           *s/ Jonathan Greenberg*
                                                 Jonathan D. Greenberg
                                                 United States Magistrate Judge


### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**